BROWN et v JACOBY et

Ohio Appeals, 1st Dist, Butler Co

No 681. Decided June 5, 1936

Woodruff & Primmer, Hamilton, and P. P. Boli, Hamilton, for plaintiffs in error.

John D. Andrews, Hamilton, and John P. Rogers, Hamilton, for defendants in error.

## OPINION

By ROSS, PJ.

This is a proceeding in error from the Court of Common Pleas of Butler County, wherein judgment was rendered against the validity of the will of Charles Jacoby.

The will in question was at first refused probate by the Probate Court, but, on appeal, the will was admitted to probate by the Court of Common Pleas of Butler County. The petition alleges simply that the "paper writing is not the last will and testament of said Charles Jacoby."

The testator at the time the will was executed, April 11, 1932, was suffering from arterio sclerosis, from which he died some ten days thereafter. He was 70 years of age. He had at that time lost completely the power of speech. His left side was entirely paralyzed, and his right side partially so. He was in great pain, and cried frequently.

In 1888, Earl A. Brown, then an inmate of the Children's Home of Hamilton, and the chief beneficiary of the testator's bounty, came to live with the testator and his wife when he was nine years of age. He was not adopted but in all other respects assumed the relationship of a son to his benefactors. When about twenty-two years of age he secured employment elsewhere. He married and lived in Seven Mile, to which place the testator and his wife soon moved, living close by the Browns. A friendly relationship continued between the Browns and the Jacobys. When Mrs. Jacoby became ill, Mrs. Brown nursed her for a year before her death, and Earl Brown rendered every assistance possible. After the death of Mrs. Jacoby, and at the request of the testator, the Browns came to live with and care for the testator in his own home. Up to the last few weeks of his life the testator was active and alert, and even in his last illness, up to a day or two before his death, there is nothing except possibly the opinion evidence of certain physicians, to indicate that he was not fully aware of those matters which had occupied his attention during his latter years. His brother was his constant adviser and suggested the necessity of making a will. Some time previous to the last illness of the testator, he told this brother of his intention to make a will, substantially in the terms of the will under consideration. A former Justice of the Peace was brought to the bedside of the testator by Earl Brown. Much is made of this fact. It seems entirely natural and reasonable that Brown should do exactly as he had been doing for years, attempt to satisfy the needs of his benefactors. Owing to the loss of voice of the testator and his partial paralysis, it was necessary for his brother to secure an expression of his wishes and intention by asking the testator questions which he answered either by nodding or shaking his head. By this method the will before us was finally drafted— read over to the testator and at the completion of the reading, he nodded his head

in token of his complete satisfaction therewith. There can be no question that it expressed exactly what the testator wished, and if he is rendered intestate, this will result in a disposition of his property in a manner entirely foreign to his expressed intention.

Something is said as to an antagonism existing between the brother of the testator and the contesting relatives. Be that as it may, there is no evidence that such feeling was permitted to unduly influence the testator in his testamentary disposition of his property. There is nothing also in the record to indicate that these contestants had done anything in the life of the testator to endear themselves to him. On the other hand, the affection and gratitude which arises in one who is the beneficiary of another's love and attention should not be considered, in the absence of definite evidence, the result of wrongful influence simply because the one who serves is not a relative. Earl Brown and his wife had during the life of the testator and his wife so conducted themselves as to warrant his gratitude and appreciation. They were as close to him as children could be. His will was entirely consistent with the relationship thus created by mutual affection.

When it became necessary for the testator to sign the will, it was found that he could not hold the pen.

Quoting from the testimony of Miss Isabelle Boughen:

"Q. Just state what was done by Charles Jacoby after the will was all completed.

A. Mr. Kumler placed a pen in Charles Jacoby's hand and he was unable to hold it as he was too weak and Mr. Kumler steadied his hand so that he was able to make his mark on the will.

Q. Did he make his mark on the will?
A. Yes sir.
Q. Then you may state how many other persons signed the will?

A. Ed. Jacoby and Mr. Kumler and I.
Q. Are you sure Ed. Jacoby signed it?
A. I think he did.
Q. You know you signed it, do you?
A. Yes sir.
Q. State whether Mr. Kumler signed it?
A. Yes sir.
Q. You may state whether or not Mr.

Charles Jacoby made his mark on the will in the presence of both you and Mr. Kumler.
A. He did.

Q. You may state whether or not you and Mr. Kumler signed the will in the presence of Charles Jacoby.
A. We did.

* * *

Q. You may state what, if any, change there was in the condition of Charles Jacoby the balance of the evening?
A. After that he was very much more quiet and I asked him if he felt better and he nodded his head in the affirmative and shortly after that he went to sleep."

C. A. Kumler testified:

"Q. Now after this conversation took place between Edwin and Charles Jacoby, what, if anything, did you do?
A. I went to the table and wrote all these items down as I remember them.

Q. And then what did you do?
A. Then after I had completed the writing, I took the will in to Charles Jacoby and asked him if he could write his name and he shook his head 'no'. I asked him if he wanted to make his mark and he shook his head 'yes,' so I wrote his name, and * * *

Q. Before you did that, did you read any part of the will to him or all of it?
A. Yes sir.

Q. I was asking you after you had written the will, then what next did you do with or about the will?
A. After I had completed writing it, I took it in to the bedroom where he was lying, the position on the left side of the bed, read the will to him, each item separately.

Q. Then what, if anything, did you say to him after each item?
A. After I read each item I asked him if that was the way he desired it written and he nodded his head.

Q. Nodded his head how?
A. 'Yes.' That was done after each item in the will. Each item was read and after each item he was asked if that was the way he wanted it made in his will, he nodded it was the way, nodded 'yes.'

Q. After you had done that, did you ask him any other question about the will?

A. As I remember it, I asked him if he wanted the nurse and myself to sign as witnesses.

Q. What, if anything did he do or say?

A. He nodded 'yes', that he did.

Q. Then what, if anything else, was said or done?

A. Oh, I wrote his name, after I asked him if he could write and he shook his head 'no.' I asked him if he wanted to make his mark and he shook his head 'yes', his name was written and he reached over and clasped, took hold of the top of the pen and the mark was made.

Q. How many persons were holding the pen?

A. Charles Jacoby and myself.

Q. Is that when the mark was made?

A. (No answer).

Q. Now after that, what, if anything, was done about the will?

A. After the mark was made, he was asked if—I asked him if he wanted the nurse and myself to sign as witnesses and he nodded 'yes', so we signed the will as witnesses.

Q. Did Mr. Jacoby use his hand on the pen when the mark was made, in the presence of you and the nurse?

A. Yes, Edwin Jacoby was also there.

Q. And Earl Brown had left.

A. Yes sir.

Q. Did you and the nurse sign the will in the presence of Charles Jacoby?

A. Yes sir.

Q. Now after you read the will, you may state whether or not you asked Mr. Jacoby if there was anyone else he wanted to put in the will?"

Plaintiffs object. Sustained.

Question withdrawn.

"Q. What, if anything, was said by you, Mr. Kumler, after you read the will to him, in reference to it?

A. I asked him if that was the way he wanted the will, or if there was some other persons he desired to leave anything and he shook his head 'no,' that he didn't desire to.

Plaintiffs object to 'that he didn't desire to.' Sustained.

Defendants except.

Q. He shook his head 'no', you said, did you?

A. Yes, to the question I asked him, did he desire to leave anything to anyone else, he shook his head 'no.'

Q. Was there anything else you asked him?

A. Asked him if the will was as he wanted it and he shook his head 'yes'."

Edwin Jacoby testified:

"A. Well, Mr. Kumler asked Charles if he wanted to make a will and he shook his head 'yes.' I asked him and he shook his head 'yes' and I asked him if he wanted to give Alma Jacoby, it was at that time, it is Kinsinger now, his share in the Francis Jacoby farm and he shook his head 'yes'—I asked him if he wanted to give Alma the $200 he said she owed him, he shook his head 'yes'—I said 'is there anybody else you want to give anything to outside of Mr. Brown and Anna Brown', and he shook his head 'no.'

Q. Now then, what else, if anything was done or said?

A. Well, Mr. Kumler went to writing the will and after he got the will wrote, he took it to his bedside and he read one item over to him at a time and asked him if that was the way he wanted it and he shook his head it was and after he got through said 'is there anyone else you want to give anything to' and he shook his head 'no.' I also asked him if he wanted Earl to be executor of the will and he said he did.

Q. Now after Mr. Kumler had read over the will to him and questioned him, then what, if anything, was done?

A. Well, Mr. Kumler asked him if he wanted Mrs. Boughen and him to sign as witnesses, he shook his head 'yes' and pointed his finger at Mrs. Boughen.

Q. What else was said?

A. Well I think that time he was asked whether he wanted Earl to be executor of the will.

Q. Now after Mr. Kumler had asked him about the witnesses, what, if anything was done?

A. Well, he asked Charles if he could write."

Plaintiffs object. Overruled.

Plaintiffs except.

"A. * * * and he shook his head 'no'. Asked him if he could make his mark and he shook his head 'yes' and Mr. Kumler took the will to Charles' bed and he made his mark. Mr. Kumler put his hand on his and he made his mark.

Q. Now after he made his mark, then what, if anything was done?

A. Well, the witnesses signed.

Q. Did you see them sign?
A. Yes sir.

Q. Who signed?
A. Mr. Kumler and Miss Boughen.
Q. And did you know whether or not Charles Jacoby when he made his mark, did so in the presence of those two wit-. nesses?
A. Yes sir.

Q. Do you know whether or not the two witnesses signed in his presence?
A. Yes sir.

Q. Do you know whether they signed in the presence of each other?
A. Yes sir."

Before taking up the several assignments of error, the rule first laid down in Sites v Haverstick et, 23 Oh St, 626, must be considered, for in Niemes v Niemes, 97 Oh St, 145, 149, this rule is definitely applied to contests of wills. We quote from the opinion of the court, pages 149, 150 in the Niemes case:

"We are still further of opinion that if it be granted that the improper inclusion of the language as to the several species of undue influence—which was entirely unsupported by proof—was prejudicial error, the defendant in error cannot take advantage of the error, being precluded therefrom by the doctrine first asserted in Ohio in the case of Sites v Haverstick et, 23 Oh St, 626, and recently reasserted in State ex Lattanner v Hills, 94 Oh St, 171, 182. This well-known rule of law is that where, upon the issues made by several defenses to a claim sued upon, a general verdict is found for the defendant, it not being disclosed by answers to interrogatories or otherwise upon which issue the verdict was based, and the record disclosing no error touching either the presentation or submission of at least one of such issues, a finding upon which in favor of the prevailing party would justify a general judgment, which is rendered, error of the trial court in the submission of other issues will be disregarded."

This rule, however, was not carried into the syllabus of the case. It would seem to be capable of producing results greatly to be deplored. This will be more clearly demonstrated as the several assignments of error are here considered. In view of the fact that the court did not see fit to incorporate this rule as to will contests into a syllabus, it may be considered full warrant for not applying the rule. A moment's consideration of the application of the rule to a will contest seems conclusive against the application of the same. As will later appear it is the duty of the court to pass upon the validity of execution where the facts are not in dispute. If the court reaches an erroneous conclusion in this respect, can it be said that no error prejudicial one way or the other has intervened, because the court correctly states the law as to undue influence, capacity to make a will, and legal age? An erroneous charge on any of the elements necessary to be proved lacking by the contestants may be as fatal to a fair trial.

The first assignment of error deals with the general charge of the court:

"In this case there are three questions for you to determine—
"First—did Charles K. Jacoby sign the paper writing purporting to be his last will and testament by mark or by some other person in his presence and by his express direction?
"The signature to the paper writing by mark in law would not be effective unless the testator gave such express direction to some person to write the signature or to make the mark."

Now there is no dispute in the evidence as to what happened. There is a dispute in the inferences to be drawn from the evidence. The facts, however, are simple and plain. The record has been quoted hereinbefore.

This court in an opinion by Hamilton, J., laid down the rule. In Aston, a minor, v Hauck et, 22 Oh Ap, 430, (4 Abs 319), the first paragraph of the syllabus is:

"Where signature to will is by mark of testatrix, it is presumed, in contest of will, in absence of contrary showing, that signature was made by express direction and mark inserted by testatrix."

The first paragraph of the syllabus in Hayes et v Hayes et, 23 Oh Ap, 522, (4 Abs 170, 5 Abs 379), is:

"In determining validity of will containing decedent's mark instead of signature,

it was duty of court to pass on question whether will was lawfully attested and executed from face of instrument itself and evidence, and submission of question to jury was prejudicial error."

See also: **Missionary Society of the M. E. Church v Ely et, 56 Oh St, 405, 414;** and **West v Lucas et, 106 Oh St, 255, 259.**

It was therefore error, prejudicial to the plaintiffs in error to submit to the jury the question of whether or not the will was legally signed. This question was a question of law for the court. The court also refused special charges finding that the will was properly signed. From the undisputed evidence, it conclusively appears that it was so signed and the failure of the court to so find was error.

The second assignment of error relates to special charge No. 10, given at the request of the contestants:

"The court tells you that a man may execute his will either by writing his name at the end thereof or by placing his mark thereon, but if you find that Charles Jacoby attempted to execute the paper writing in question by placing his mark thereon, and if you find also that the name 'Charles Jacoby' was written in by someone other than Charles Jacoby himself, nevertheless the paper writing in question is improperly executed as a will unless you also find that such other person wrote in the name of Charles Jacoby at his express direction. Such direction may be made by word of mouth or by any other proper sign so indicating such a request."

What has been said also places this charge as error.

The third assignment of error applies to giving special charge No. 4, which is:

"Undue influence or duress is usually not a positive thing that can be shown by direct evidence, but may be shown by circumstantial evidence and by inference drawn from a full presentation of facts and influences which bore upon the preparation of the will."

This charge is not to be commended for clarity. Its meaning is, to say the least, doubtful. It is not approved. Standing alone it would not, however, constitute prejudicial error.

Special charge No. 6, complained of, is as follows:

"Even if you find that Charles K. Jacoby at some time prior to April 11th, 1932, intended to make a will similar in contents to the will submitted to you in this cause, this fact of itself will not be sufficient to justify you in sustaining the will herein. You must further find that at the time this will was drawn and executed on April 11th, 1932, Charles K. Jacoby had testamentary capacity sufficient to make and execute a last will, and that the will submitted to you contains the testamentary disposition that Charles K. Jacoby intended to make of his property at said time, and you must further find that Charles K. Jacoby was free from undue influence at the time."

The first paragraph of the syllabus in West v Lucas, supra, is:

"Instructions by the trial court in a will contest must clearly define the rule that the evidence introduced by contestant, in order that he may prevail, must be a preponderance, outweighing both the evidence produced by the contestee and the presumption of validity that arises from probate of the will."

While it is undoubtedly true that if a special charge states a correct rule of law applicable to the facts, it must be given even though it fails to state all the law applicable thereto. **Bartson, etc. v Craig, 121 Oh St, 371.** Still if the necessary inference to be drawn from such charge is improper, the giving of such charge is prejudicial error.

Any layman reading or hearing this charge read would be impelled to the conclusion that it would be duty of the proponents of the will to sustain it—the charge states "justify you in sustaining the will herein." If such a charge could be properly framed it would be necessary to state a rule applicable to a situation justifying the jury in **not sustaining** the will—or finding it invalid. The jury is always justified in sustaining the will by the presumption attending the probate. It is never justified in finding against its validity unless

by a preponderance of the evidence such invalidity had been determined.

This charge was therefore entirely misleading and erroneous.

The same criticism applies to special charge No. 7—which augments the effect of the previous charge.

"The court says to you that if you find the paper writing purporting to be the last will and testament of Charles K. Jacoby, contains statements as to disposition of his property, which he may have made at some prior time, such fact does not of itself make the alleged will submitted to you the last will and testament of Charles K. Jacoby, but you must find as a matter of fact that such alleged will submitted to you as of date of April 11, 1932, contains in fact the complete testamentary disposition of said Charles K. Jacoby's property as he intended it to be made at said time on April 11, 1932, and you must further find that he had at such time testamentary capacity to make and execute said will, and was free from restraint."

The fifth assignment of error deals with questions propounded to opinion experts. One of these questions is typical:

"Q. You may state doctor, whether or not Charles K. Jacoby, afflicted as the hypothetical question indicated, having suffered the suffering from those ailments, whether or not such a man in your opinion on the evening of April 11th, 1932, had sufficient mind and memory to understand the nature of business which required him to comprehend generally the nature and extent of his property; to understand the nature of the business in which he was engaged; to hold in his mind the names and identity of those who have claims upon his bounty, and to be able to appreciate his relations to the members of his family—whether or not he had such mental capacity."

Defendants object. Overruled.
Defendants except.

"A. In my opinion he would not have had the mental capacity.

Q. To perform that kind of a business act, do you mean?
A. To perform that act."

In **Dunlap** v **Dunlap**, 89 Oh St, 28, the syllabus is:

"In proceedings in contest of last will and testament the question: 'You may also further state whether or not he (the testator) had capacity to form a purpose and intention of disposing of his property by will' does not come within the rule of inhibition laid down by this court in case of **Runyan** v **Price, 15 Oh St, 1,** and the admission of such testimony by the trial court is not error justifying the setting aside of a verdict of a jury sustaining the validity of a last will and testament."

The question in view of the authority is not objectionable.

The fifth assignment of error states misconduct of counsel and irregularity of the court.

When the court has definitely indicated its attitude toward a certain line of examination as being adverse thereto, and counsel has had a ruling thereon, it is improper for counsel to continue to adhere to questioning along the same line. The obvious purpose in the instant case was to prejudice the jury against the chief beneficiary Brown. The court ruled repeatedly, excluding evidence that Brown had borrowed money from a brother of the testator and had been sued by his widow. Counsel are officers of the court. They are presumed to know the law. The questions asked were irrelevant and immaterial. The court so ruled and yet counsel persisted in this line of questioning. This was misconduct, improper, and prejudicial to the will proponents.

The sixth assignment of error is addressed to the weight of the evidence.

The verdict was manifestly against the weight of the evidence. The contestants failed to show by a preponderance of the evidence that the will was not properly executed, or that the testator did not have capacity to make a will, or that he was under any undue influence. The law requires that in a will contest the issue shall be determined by a jury. For this reason the cause is remanded to the Court of Common Pleas of Butler County for a new trial, the judgment of that court being reversed.

MATTHEWS and HAMILTON, JJ, concur.